IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN EDWARD McQUIN, | ) | CASE NO. 3:12CV1704 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff John Edward McQuin ("Plaintiff" or "McQuin") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  As set forth below, the Administrative Law Judge ("ALJ") failed to explain adequately the bases for her determinations regarding McQuin's residual functional capacity ("RFC") and the question whether his impairments met or equaled a Listing.[2]  For these reasons, the final decision of the Commissioner should be **REVERSED** and **REMANDED.**

## I.  Procedural History

On May 27, 2008, McQuin filed an application for SSI, alleging a disability onset date of August 2, 2007.  Tr. 135-37.  He later amended his alleged onset date to May 27, 2008.  Tr. 40.  McQuin claimed that he was disabled due to a combination of impairments, including leg and

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

foot pain, back pain, rectal bleeding, and numerous psychological conditions.  Tr. 86-89, 92-94.

His claim was denied initially and on reconsideration, and he thereafter requested a hearing

before an administrative law judge.  Tr. 82-85, 95-96.  On October 29, 2010, a hearing was held

before Administrative Law Judge Melinda D. Hart (the "ALJ").  Tr. 31-60.  On December 6,

2010, the ALJ issued a decision finding that McQuin was not disabled.  Tr. 16-33.  McQuin

requested review of the ALJ's decision by the Appeals Council on December 20, 2010.  Tr. 15.

On May 3, 2012, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Background

McQuin was born on August 10, 1968, and was 39 years old on the date his application

was filed.  Tr. 27.  He has a seventh-grade education.  Tr. 43.  McQuin lived in an apartment

with his mother at the time of the administrative hearing.  Tr. 42.  He worked previously as a car

washer, lawn mower, and materials handler.  Tr. 74.

### B.      Medical Evidence

#### 1.      Treatment History[3]

McQuin presented to the emergency department at St. Vincent Mercy Medical Center on

July 2, 2008, with complaints of hallucinations and auditory voices.  Tr. 241.  He was discharged

later that day and transferred to Rescue Mental Health Services ("Rescue") for an intake

assessment.  Tr. 246.  At Rescue, McQuin denied any prior psychiatric treatment or medication.

Tr. 253-54.  The caseworker indicated that, although McQuin had poor insight, poor judgment,

and dysphoric mood, he was fully oriented, had intact memory, normal intellectual functioning,

---

[3] McQuin's brief focuses primarily on his mental health impairments.  Therefore, this Report & Recommendation shall also focus on McQuin's medical history as it relates to his mental health impairments.

organized thought process, no suicidal ideations, sufficient focus, and sufficient concentration. Tr. 254.  The caseworker assigned a Global Assessment Functioning ("GAF)" score of 50.[4]  Tr. 257.  She noted inconsistencies between McQuin's statements and actions.  For example, the caseworker observed that McQuin appeared quiet when left alone in a room but when others were around he cried, held his head, and complained of both voices and pain in his head.  Tr. 255.  The caseworker also observed that, although McQuin answered questions, he provided different answers when asked to clarify.  Tr. 258.  As a result, the caseworker noted that McQuin appeared to be selective in his memory. Tr. 254. He was prescribed Seroquel and Celexa. Tr. 259.

After his discharge from Rescue, McQuin was referred to Unison Behavioral Health Group ("Unison") for treatment.  Tr. 324.  An initial assessment report, dated July 15, 2008, indicated that McQuin was guarded and suspicious, hypervigilant, and highly defensive.  Tr. 330. He repeatedly stated that he did not like or trust other people. Tr. 330.  His affect was blunted and flat, and his mood was irritable and volatile. Tr. 330.  He displayed possible auditory and visual hallucinations.  Tr. 330.  The intake clinician diagnosed schizophrenia, paranoid type and unspecified.  His GAF score was 35.[5]  Tr. 330.

On July 17, 2008, Usha Salyi, M.D., saw McQuin and reported that he looked very sleepy and had poor eye contact.  Tr. 334.  McQuin complained of chronic back pain as well.  Tr. 334.  Progress notes from Unison from July 31, 2008, indicate that McQuin was unable to stay

---

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

[5] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV-TR, at 34.

focused during a therapy session long enough to discuss his anger issues.  Tr. 343.  It was also noted that McQuin was depressed and had an angry mood, and that he also had auditory hallucinations.  Tr. 344.  His dosage of Seroquel was increased.  Tr. 344.  At a therapy session on August 14, 2008, McQuin was once again unable to remain focused during a therapy session. Tr. 345.  At a session on August 21, 2008, McQuin was observed to have a depressed, anxious, and worrisome mood.  Tr. 350.  He stated that he felt "afraid," did not like to be in a crowd, and slept restlessly.  Tr. 351.  He stated that the medication was helping somewhat.  Tr. 351.  On August 28, 2008, McQuin was again noted to get angry easily.  Tr. 352.

McQuin began regular treatment with Tufal Khan, M.D., a psychiatrist, on September 11, 2008.  Tr. 356.  Dr. Khan's initial evaluation relayed McQuin's complaints of auditory hallucinations and paranoia. Tr. 356.  McQuin also reported that he had occasional periods where his thoughts would "block."  On examination, Dr. Khan found that McQuin had a linear and goal-directed thought process, had no hallucinations or delusions, had no suicidal or homicidal ideations, had no significant deficits in memory, had intact abstract thinking, and had average intelligence.  Tr. 357.  Dr. Khan diagnosed McQuin with chronic schizophrenia, paranoid type, assigned him a GAF score of 50, and prescribed Seroquel and Celexa.  Tr. 357.  McQuin told Dr. Khan that he was receiving Social Security Disability until 10 year ago when it was "cut off" because he was charged with a felony.  Tr. 357.  McQuin stated that, now that he was receiving treatment for his impairments, he hoped that it might help his disability claim.  Tr. 357.  McQuin saw Dr. Khan on November 17, 2008.  Dr. Khan maintained the diagnosis of schizophrenia, paranoid type, and continued to prescribed Seroquel and Celexa.  Tr. 379.

Nursing notes indicate that McQuin was seen regularly throughout 2008 at Unison for follow-up appointments.  On September 25, 2008, he was observed to be less depressed and

anxious, and was focusing better .  Tr. 366.  However, on October 3, 2008, his depression was recorded as 10 out of 10.  Tr. 367.  The nurse noted that McQuin's aunt had died and that he had attended her funeral.  Tr. 367.  On November 26, 2008, McQuin stated that his depression was 5 out of 10.  Tr. 382.  On December 30, 2008, McQuin reported that his depression was 7 or 8 out of 10 (Tr. 391), and told the nurse that he "can't handle people in my face."  Tr. 392.  His Seroquel was increased.  Tr. 391.

McQuin continued his regular follow-up appointments at Unison in 2009.  On January 22, 2009, Dr. Khan reported that Mr. McQuin appeared to be "doing well."  Tr. 410.  The diagnosis remained schizophrenia, paranoid type, and he continued to prescribe Seroquel and Celexa.  Tr. 410.  On March 13, 2009, nursing notes indicate that McQuin was not doing as well.  Tr. 416.  He exhibited some paranoia and stated that he had suffered an injured jaw during a physical altercation with his nephew.  Tr. 416.  At follow-up appointments on March 26, 2009, April 30, 2009, June 10, 2009, August 13, 2009, and October 22, 2009, Dr. Kahn reported that McQuin was doing well and was compliant with his medications.  Tr. 422, 432, 448, 553, and 576.  He continued to diagnose schizophrenia, paranoid type, and continued to prescribe Seroquel and Celexa.  *Id.*

In a letter dated November 4, 2009, Dr. Khan opined that McQuin was totally disabled without consideration of any past or present drug or alcohol use.  Tr. 467.  He also stated that drug and/or alcohol use was not a material cause of McQuin's disability.  Tr. 467.

McQuin continued to see Dr. Khan on a bi-monthly basis throughout 2010.  Progress notes from those visits indicate that Mr. McQuin was doing well on his medications.  Tr. 655-658, 682.  Dr. Khan continued to diagnose schizophrenia, paranoid type, and continued to prescribe Seroquel and Celexa.  *Id.*

On September 1, 2010, Dr. Khan partially completed at Psychiatric/Psychological Impairment Questionnaire for McQuin.  Tr. 617-624.  He confirmed the diagnosis of schizophrenia, chronic, paranoid.  Tr. 617.  He assessed a GAF score of 52.[6]  Tr. 617.  Dr. Khan did not complete the section of the form for identifying the clinical findings that demonstrated and/or supported his diagnosis.  Tr. 618.  Notably, he also did not complete the section of the form for identifying any functional limitations caused by McQuin's mental impairments.  Tr. 619-622.  Notwithstanding these omissions, Dr. Khan opined that McQuin was incapable of handling even a low-stress work environment.  Tr. 623.  He also stated that McQuin is not a malingerer.  Tr. 623.  He further indicated that McQuin's condition produced both good and bad days, and that he would likely miss work more than three times a month because of his condition.  Tr. 623-624.

## 2.     State Agency Physicians

### a.     Dr. Hammerly – State Agency Consulting Physician

At the state agency's request, McQuin saw Mark Hammerly, Ph.D., for a mental consultative examination on July 28, 2008.  Tr. 278-79.  Dr. Hammerly noted that McQuin was rude, antagonistic, and unhygienic.  Tr. 278.  He stated that McQuin demanded to know why he had been sent to the doctor's office and stuffed food into his mouth in an attempt to make a mess on the floor.  Tr. 278.  He also made a "nonsensical angry retort" when asked how he arrived at the examination.  Tr. 278.  Due to McQuin's angry outbursts, Dr. Hammerly refused to interview McQuin.  Tr. 278-79.

---

[6]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

**b.**      **Dr. Robie – State Agency Consulting Physician**

McQuin presented to psychologist Karen Robie, Ph.D., on August 19, 2008, for a second mental consultative examination.  Tr. 281-84.  Dr. Robie noted that McQuin was cooperative but concluded that he may have exaggerated pathology in his answers because some responses seemed credible, while others were vague and confusing.  Tr. 281.  McQuin told Dr. Robie that he could not work because of violent outbursts and fighting, although he could not provide any specific examples of things that had triggered fighting in the past.  Tr. 281.  During the interview, McQuin misreported basic facts, such as the weather and the color of the furniture in the office.  Tr. 283.  In addition, Dr. Robbie noted that, although McQuin had attempted suicide in the past and alleged depression, he expressed no suicidal intent at the time of the evaluation.  Tr. 283.  Dr. Robbie also noted that, although McQuin had a poor memory and alleged difficulty with math problems, he was able to repeat three digits forwards and two in reverse.  Tr. 283.  Dr. Robie further noted that McQuin had normal speech, functional language skills, and an organized thought process.  Tr. 283.  However, he could not name 5 large cities and had difficulty with spelling.  Tr. 283.  McQuin stated that medication controlled his racing thoughts.  Tr. 283.

Dr. Robie opined that McQuin had a marked impairment in his ability to relate to others, including fellow workers and supervisors; she found marked impairment because of McQuin's social skill deficits, reactivity and paranoia.  Tr. 284.  Dr. Robie also opined that McQuin had a marked impairment in his ability to understand, remember and follow instructions; she found marked impairment because of McQuin's "pronounced difficulties with accuracy evident during today's evaluation."  Tr. 284.  In addition, Dr. Robie opined that McQuin had a marked impairment in his ability to maintain attention to perform simple or multi-step repetitive tasks; she again found marked impairment because of McQuin's "pronounced difficulties with

accuracy evident during today's evaluation." Tr. 284.  Dr. Robie further opined that McQuin

had a moderate impairment in his ability to withstand the stress and pressures associated with

day-to-day work; she found only moderate impairment in this area due to McQuin's reactivity

Tr. 284.  Dr. Robie assigned a GAF score of 40 and diagnosed McQuin with an unspecified

mental disorder.  Tr. 284.  Dr. Robie noted that, while there may be a psychotic disorder, "there

was not sufficient evidence during th[e] evaluation to warrant even a not otherwise specified

diagnosis of the same."  Tr. 284.

### c.     Drs. Swain and Umana – State Agency Reviewing Physicians

State agency reviewing psychiatrist Jennifer Swain, Psy.D., was unable to prepare a

Psychiatric Review Technique assessment on March 20, 2009, due to insufficient evidence.  Tr.

309-22.  Roseann Umana, Ph.D., reached the same conclusion upon review of the file on July 19,

2009.  Tr. 465.

### d.     Cooperative Disability Investigations Unit

Disability Determination Services ("DDS") referred McQuin's case to the Cooperative

Disability Investigations Unit[7] ("CDI") to ascertain whether he was exaggerating or lying about

his disabilities.  Tr. 291-302.  The CDI Unit Leader interviewed both McQuin and his mother.

Tr. 294-95.  The resulting Report of Investigation, dated March 11, 2009, indicated that McQuin

was cooperative, that he did not have any memory or understanding problems, that he was not

---

[7]  The CDI unit investigates disability claims under SSA's Title II and Title XVI programs that State disability examiners believe are suspicious. The CDI program's primary mission is to obtain evidence that can resolve questions of fraud before benefits are ever paid.  The process typically begins with a fraud referral from either the DDS or Social Security Administration to the CDI Unit.  Disability fraud includes, but is not limited to, exaggerating or lying about disabilities. The CDI Unit Team Leader works with state or local law enforcement members of the team to investigate the allegations, either by interviewing the applicant and third parties and/or conducting surveillance of the applicant. Upon completion of the investigation, a report detailing the investigation is sent to the DDS, where DDS staff serves as the ultimate decision-making entity in determining whether a person is eligible to receive a monthly disability benefit payment.  *See* Office of the Inspector General, Social Security Administration, Cooperative Disability Investigations (Jan. 15, 2013, 10:32am), *available at* http://oig.ssa.gov/cooperative-disability-investigations-cdi.

anxious or depressed, and that he was not paranoid.  Tr. 293.  The investigator found that, although McQuin alleged he had a long history of mental illness, the investigation revealed no evidence to support the claim.  Tr. 292.  The investigator also indicated that McQuin could perform all of his daily needs without assistance including dressing, bathing, eating, and going to the bathroom.  The investigator further stated that McQuin could travel outside his home independently, could visit with friends independently, and could independently go to the grocery store on his own without fear and apprehension.  Tr. 295.  In addition, the investigator interviewed McQuin's mother and noted that she did not mention any mental disability that would prevent McQuin from interacting with others on a daily basis.  Tr. 295.  The investigator concluded that statements made by McQuin during the interview were inconsistent with statements contained in an "Adult Function Report" that McQuin completed on June 30, 2008.  Tr. 296.  The investigator then returned the file to DDS, noting that further investigation and possible criminal prosecution might be initiated at a later date.  Tr. 297.  There is no evidence in the record of any further action taken as a result of CDI's investigation.

**C.    Administrative Hearing**

**1.    McQuin's Testimony**

On October 29, 2010, McQuin appeared with counsel and testified at an administrative hearing before the ALJ.  Tr. 39-70.  McQuin testified that he could not work because of his depression and schizophrenia.  Tr. 58.  He stated that he believes he will hurt himself and others in a work setting.  Tr. 58.  He also stated that he has difficulty controlling his anger, has fits of rage, crying spells, and intense paranoia.  Tr. 62-63.  McQuin testified that he was fired from his previous jobs because of his anger problems.  Tr. 67.  He also testified that he has difficulty with attention and concentration.  Tr. 68.  McQuin stated that he has racing thoughts and

hallucinations.  Tr. 51, 65.

On an average day, McQuin stated that he wakes up, eats breakfast, takes Celexa, sleeps until 2:00 p.m. or 3:00 p.m., and then eats again.  Tr. 55.  He does not often watch television and does not have friends.  Tr. 55.  He does not go to church and does not have any hobbies.  Tr. 56. McQuin stated that his reading ability is limited to very simple words.  Tr. 61.  He also stated that he does not know how to use a cellular telephone and that he gets too confused to do housework.  Tr. 53-54.  He explained that his mother cooks for him, washes his dishes, and does his laundry.  Tr. 53.  However, he stated that he can handle his personal care, that he can shop at Goodwill, that he could vacuum the floor, that he could take out the garbage, and that he could do housework if his mind was not confused.  Tr. 52-54.  McQuin stated that, at times, he has chosen to live on the street in order to get away from other people.  Tr. 60.

### 2.      Vocational Expert's Testimony

Charles McVie (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 71-81.  The ALJ asked the VE whether a hypothetical individual with McQuin's vocational characteristics and the following limitations could perform his past work:

> [R]etains a capacity to perform work without exertional limits, but with the following limits:  low-stress jobs, that are defined as having occasional decision-making and occasional changes in the work setting; and occasional interaction with the public, coworkers, and supervisors.

Tr. 73.  The VE testified that the hypothetical individual could perform McQuin's past relevant work as a lawn mower and a material handler.  Tr. 73-75.  The VE further stated that the hypothetical individual could perform other jobs that existed in significant numbers in the national economy, including hand packager  (6,000 jobs in Ohio, and 150,000 jobs nationally) and floor waxer (75,000 jobs in Ohio, and 300,000 jobs nationally).  Tr. 74-75.

In an additional hypothetical, McQuin's attorney asked the VE whether adding the limitation that the person would not be able to accept criticism from his supervisor regarding his work product would affect his employability. Tr. 78-79.  The VE responded that, with the additional limitation, the hypothetical person would not be able to perform any competitive work. Tr. 78-79.  McQuin's attorney then further modified the hypothetical to incorporate the limitations assessed by the state agency consulting physician, Dr. Robie, i.e., that the hypothetical individual was markedly limited in his ability to relate to others, markedly limited in his ability to understand, remember, and follow instructions, markedly limited in his ability to maintain attention to perform simple or multi-step tasks, and moderately limited in his ability to withstand work pressures.  Tr. 79.  The VE responded that such an individual would not be able to perform any competitive work.  Tr. 79-80.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

11

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that McQuin had not engaged in substantial gainful activity since May 27, 2009, the alleged onset date.  Tr. 21.  At Step Two, the ALJ found that McQuin had the following severe impairments: schizophrenia – chronic, paranoid type.  Tr. 21.  At Step Three, the ALJ found that McQuin did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.  Tr. 21.  The ALJ then determined McQuin's RFC and found

12

that he could perform a full range of work at all exertional levels but with the following non-exertional limitations: no interaction with public or coworkers, occasional interactions with supervisors, and low stress jobs defined as involving occasional decision making and occasional changes in work setting. Tr. 22. At Step Four, the ALJ determined that McQuin could perform his past relevant work as a material handler. Tr. 27. In addition, the ALJ made an alternative finding at Step Five that McQuin could perform other jobs that existed in significant numbers in the national economy. Tr. 27-28. The ALJ concluded that McQuin was not disabled. Tr. 28.

## V. Arguments of the Parties

McQuin objects to the ALJ's decision on four grounds. First, he argues that the ALJ erred in finding that his mental impairments did not meet or equal Listing 12.03. Second, McQuin contends that the ALJ did not properly weigh the medical opinion evidence. Third, he asserts that the ALJ failed to properly evaluate his credibility. Fourth, McQuin argues that the ALJ improperly relied upon flawed vocational expert testimony.

In reply, the Commissioner contends that substantial evidence supports the ALJ's determination that McQuin did not meet or equal Listing 12.03. The Commissioner also argues that the ALJ properly weighed the treating source opinions and properly evaluated McQuin's credibility. Finally, the Commissioner asserts that the ALJ properly accepted the VE's testimony, which was in response to a hypothetical that included all of McQuin's credibly established limitations.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ failed to explain adequately the basis for her RFC determination**

McQuin contends that the ALJ's RFC determination is not supported by substantial evidence because she failed to evaluate properly the medical opinion evidence. Doc. 12, p. 10. Under this argument, McQuin contends, *inter alia*, that the ALJ improperly substituted her own judgment for that of a doctor and improperly relied on her own expertise in deciding McQuin's RFC. Doc. 12, p. 11. Reviewing the record as a whole, the undersigned finds that the ALJ erred because she failed to explain adequately the basis for her RFC determination.

A claimant's RFC is a measure of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on the relevant evidence. 20 C.F.R. §§ 404.1545, 404.1546(c). In reaching an RFC determination, the ALJ may consider both medical and non-medical evidence. *Poe v. Comm'r of*

14

*Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  However, the ALJ must not substitute her own

judgment for a doctor's conclusion without relying on other medical evidence or authority in the

record.  *See Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963) ("While the Secretary [now

the Commissioner] may have expertise in respect of some matters, we do not believe he

supplants the medical expert"); *Miller v. Commissioner of Social Security*, No. 1:07cv759, 2008

WL 4445189 *3 (S.D. Ohio Sept. 29, 2008) ("ALJ must not substitute his own judgment for a

doctor's conclusion without relying on other medical evidence or authority in the record.").

Numerous courts have stressed the importance of medical opinions to support a

claimant's RFC and cautioned ALJs against relying on their own expertise in drawing RFC

conclusions from raw medical data.  *See, e.g., Mabra v. Comm'r of Soc. Sec.,* No. 2:11–cv–

00407, 2012 U.S. Dist. LEXIS 84504, *25–32, 2012 WL 2319245 (S.D. Ohio June 19, 2012);

*Isaacs v. Comm'r of Soc. Sec.,* No. 1:08–CV–00828, 2009 U.S. Dist. LEXIS 102429, at *10,

2009 WL 3672060 (S.D. Ohio Nov. 4, 2009) ("The residual functional capacity opinions of

treating physicians, consultative physicians, and medical experts who testify at hearings are

crucial to determining a claimant's RFC because '[i]n making the residual functional capacity

finding, the ALJ may not interpret raw medical data in functional terms'") (quoting *Deskin v.

Comm'r of Soc. Sec.,* 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)); *Nguyen v. Chater,* 172 F.3d 31,

35 (1st Cir.1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw

medical data in functional terms and no medical opinion supported the [ALJ's RFC]

determination").  Moreover, this Court has found that an ALJ is not qualified to translate raw

medical data into functional capacity determinations.  *Roso v. Comm'r of Soc. Sec.,* No.

5:09CV198, 2010 U.S. Dist. LEXIS 28308, at *8, 2010 WL 1254831 (N.D. Ohio Mar. 11, 2010)

("[T]he ALJ is simply not qualified to interpret the raw medical data in these MRI reports and no medical opinion in the record supports the ALJ's determination").

In this case, the ALJ assessed McQuin's RFC and determined that he could perform a full range of work at all exertional levels but with the following non-exertional limitations: no interaction with public or coworkers, occasional interactions with supervisors, and low stress jobs defined as involving occasional decision making and occasional changes in work setting. Tr. 22.  The ALJ stated that she based her RFC assessment on the medical evidence in the record, as well as McQuin's testimony.  Tr. 26.

In weighing the medical opinion evidence, the ALJ did not assign controlling weight to the opinion of the treating psychologist, Dr. Khan, but failed to explain what weight she did assign the opinion.[8]  Tr. 25-26.  Significantly, although Dr. Khan opined that McQuin was incapable of handling even a low-stress work environment, he failed to provide an assessment of McQuin's functional limitations.  Tr. 619-622.  Thus, his assessment was not instructive with regard to any work-related limitations McQuin had because of his mental impairments.  Next, the ALJ gave "little weight" to the assessment of Dr. Robie, the state agency medical consultant, although hers was the only medical opinion to provide an assessment of McQuin's work-related limitations.  Tr. 26.  As set forth above, Dr. Robie opined that McQuin had a marked impairment in his ability to relate to others, including fellow workers and supervisors; a marked impairment in his ability to understand, remember and follow instructions; a marked impairment in his ability to maintain attention to perform simple or multi-step repetitive tasks; and a moderate impairment in his ability to withstand the stress and pressures associated with day-to-day work. Tr. 284.  The ALJ discredited this opinion, in part, because Dr. Robie stated that she did not have

---

[8] Because remand is appropriate, the ALJ should also explain the specific weight she assigned to the opinion of Dr. Khan.

16

sufficient evidence to give a specific diagnosis of McQuin's condition and because subsequent records from Dr. Khan conflicted with Dr. Robie's findings. Tr. 26.

The ALJ did not discuss or give any weight to the opinions of the two state agency reviewing physicians. Both of those physicians reviewed the medical records for purposes of assessing McQuin's mental impairments but were unable to complete Psychiatric Review Technique assessments due to insufficient evidence. Thus, they did not render any opinions as to McQuin's functional limitations. Tr. 309-22; 465.

As stated above, Dr. Robie was the only medical professional to give an opinion on the functional limitations caused by McQuin's mental impairments. The ALJ did not accept this as a credible assessment and then found, without any other medical opinion supporting her conclusions, that the only functional limitations McQuin had due to his mental impairments were that he should not have any interaction with the public or coworkers, only occasional interactions with supervisors, and could only perform low stress jobs defined as involving occasional decision making and occasional changes in work setting. Without any medical opinion to support this determination, it is unclear how the ALJ arrived at her RFC determination.

Given the existing record, the undersigned can only deduce that the ALJ's mental RFC determination was based on her own interpretation of McQuin's capabilities. In other words, it appears that the ALJ improperly assumed the role of a medical expert and substituted her opinion for that of a medical professional. The ALJ therefore impermissibly acted as her own medical expert in this case. *See Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985); *Jeffers v. Astrue,* No. 09 C 6225, 2010 WL 4876726, * 19 (N.D. Ill. Nov.19, 2010) ("By neglecting to flesh out the record in order to support her RFC assessment, the ALJ acted contrary to controlling case law that prohibits ALJ's from the temptation to 'play doctor' and substitute their own independent

medical findings for those found in the record."); *Bowman v. Commissioner of Social Sec.*, No. C–1–06–756, 2009 WL 3110197 (S.D. Ohio Sept. 24, 2009) ("While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, he is not permitted to make his own evaluations of the medical findings.").

That the ALJ improperly assumed the role of a medical expert in this case is supported by the fact that both of the state reviewing physicians, considered under agency regulations to be experts in their fields, concluded that there was insufficient evidence in the record to complete an assessment of McQuin's functional limitations.[9]  If there was not enough information in the record for two medical professionals to asses McQuin's mental impairments and his functional limitations, on what basis could the ALJ, a layperson, make such a determination?  And, even if there were sufficient evidence in the record for a medical expert to base an opinion on, the ALJ should have obtained another medical opinion on this issue; it was improper for her to assume the role of a medical expert and make the determination without a medical opinion.  As such, at least based on the current record, substantial evidence does not support the ALJ's RFC assessment and remand is appropriate.  On remand, the ALJ should explain the reasoning behind her RFC assessment and build a clear and logical bridge from the medical evidence to her assessment.  If necessary, the ALJ should consult a medical expert and/or obtain clarification of the evidence to flesh out the record in order to support her RFC determination.  *See Bailey v. Barnhart,* 473 F.Supp.2d 842, 849-50 (N.D. Ill. 2006) ("[h]aving rejected the available medical record upon which to base an RFC assessment, the ALJ was then required to call a medical advisor and/or obtain clarification of the record to flesh out what she needed to support her decision").

---

[9] Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927.

**C.**     **The ALJ failed to explain adequately the basis for her Step Three determination**

McQuin also asserts that the ALJ erred under Step Three in finding that his impairments did not meet or equal Listing 12.03.  Doc. 12, p. 8.  For reasons similar to those stated above, the undersigned finds that the ALJ also failed to explain adequately the basis for her determination under Step Three of the sequential analysis.

For a claimant to show that his impairment matches an impairment in the Listings, he must meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  McQuin argues that his mental impairments meet all of the required criteria under Listing 12.03 for schizophrenic, paranoid and other psychotic disorders.  Listing 12.03 provides:

> *Schizophrenic, paranoid and other psychotic disorders*:  Characterized by the onset of psychotic features with deterioration from a previous level of functioning.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.  Medically documented persistence, either continuous or intermittent, of one or more of the following:
>
>> 1.  Delusions or hallucinations; or
>> 2.  Catatonic or other grossly disorganized behavior; or
>> 3.  Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following (a. Blunt affect; or b. Flat affect; or c. Inappropriate affect); or
>> 4.  Emotional withdrawal and/or isolation; AND
>
> B.  Resulting in at least two of the following:
>
>> 1.  Marked restriction of activities of daily living; or
>> 2.  Marked difficulties in maintaining social functioning; or
>> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>> 4.  Repeated episodes of decompensation, each of extended duration; OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.03.

The ALJ conducted a review of McQuin's mental impairments and found that his impairments did not meet or equal Listing 12.03. Specifically, under the paragraph B criteria, the ALJ found that McQuin's schizophrenia caused no more than mild restrictions in the activities of daily living, no more than moderate difficulties in the ability to maintain social functioning, and no more than moderate deficiencies in concentration, persistence or pace. Tr. 21. In support, the ALJ noted that McQuin could maintain personal hygiene and grooming, which included obtaining medical and psychological treatment, prescription medications, and extensive dental work. Tr. 21-22. The ALJ also noted that McQuin testified that he utilized public transportation, shopped for himself, had no problems utilizing community resources when he needed assistance, and desired to live on his own. Tr. 21-22. The ALJ further noted that McQuin's treating physician reports did not indicate that he had a low IQ or reduced intellectual functioning. Tr. 22. She also found that there was no evidence that McQuin had any episodes of decompensation for an extended period. Tr. 22. The ALJ therefore determined that McQuin failed to satisfy the requirements in paragraphs A and B of the Listing. Tr. 21-22. Additionally, the ALJ noted that there was no evidence that McQuin had a history of an inability to function

outside a highly supportive living arrangement and no evidence that he was completely unable to function outside the area of his home.  Tr. 22.  The ALJ therefore concluded that McQuin also failed to satisfy the requirements of paragraph C of the Listing.  Tr. 22.

McQuin argues that the ALJ committed reversible error because she ignored the functional limitations set forth by Dr. Robie, the state agency consulting physician, who opined that McQuin had marked limitations in social functioning and marked limitations in concentration, persistence, or pace.  At Step Three, the ALJ did not mention Dr. Robie's assessment, which, if credited, would have established the paragraph B criteria for Listing 12.03.  However, as discussed above, in determining McQuin's RFC, the ALJ did address Dr. Robie's opinion and assigned it little weight.  There is no other opinion by a medical professional in the record on the issue of whether McQuin satisfied the paragraph B criteria.  Without a medical opinion to support her determination, the ALJ focused her analysis at Step Three on her interpretation of McQuin's activities of daily living, which she found established that McQuin had only moderate or mild limitations with regard to the paragraph B criteria.  This was problematic because the report from Dr. Robie notes that she was aware that McQuin engaged in activities of going to the park, shopping, selling aluminum cans for money, and bathing about once a week, as well as McQuin's capacity to engage in treatment at Unison Behavioral Health Group.  Tr. 281-283.  Despite his ability to engage in such activities, Dr. Robie concluded that McQuin had marked impairments in the paragraph B criteria.  As such, the ALJ's reliance on McQuin's activities of daily living to find that the paragraph B criteria were not satisfied, without discussing the contrary opinion from Dr. Robie, was improper.  *See Wilkerson v. Com'r of Social Sec.*, No. 3:08cv419, 2010 WL 817307 (S.D. Ohio 2010) (citing *Loza v. Apfel*, 219

F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.")).

Again, it appears that the ALJ improperly assumed the role of a medical expert in determining that McQuin did not satisfy the paragraph B criteria of Listing 12.03.  The only opinion by a medical professional in the record with regard to the paragraph B criteria is that of Dr. Robie, which the ALJ rejected.  The ALJ substituted her opinion, which was based on McQuin's activities of daily living, for that of a doctor.  Therefore, remand is appropriate so that the ALJ can explain the reasoning behind her Step Three analysis and build a clear and logical bridge from the medical evidence to her finding.

**D.      Other Issues**

Because remand is appropriate, the undersigned will not address McQuin's remaining arguments.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VI.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff John Edward McQuin's application for SSI should be REVERSED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

Dated: March 25, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).